IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| LOTHAR KUSTER, | ) | |
| | ) | Civ. Nos. 07-00264 SOM/BMK |
| Plaintiff, | ) | Civ. Nos. 07-00265 SOM/BMK |
| | ) | (Consolidated) |
| vs. | ) | |
| | ) | ORDER GRANTING DEFENDANTS' |
| MICHAEL W. FOLEY, et al, | ) | MOTION FOR SUMMARY JUDGMENT |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| LOTHAR KUSTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| COUNTY OF MAUI, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

I.      INTRODUCTION.

          This case arises out of Plaintiff Lothar Kuster's
attempt to develop one of three adjacent properties he owns on
Maui, Hawaii.  The property in question is undeveloped land with
an agricultural business on it located in a Special Management
Area subject to chapter 205A of the Hawaii Revised Statutes.

          On May 18, 2007, Kuster filed two complaints arising
out of his inability to build a structure on his undeveloped
property in the absence of necessary permits.  In essence, Kuster
complains that his application to determine whether he needs to
go through the Special Management Area permitting process has

taken too long to decide.  He also complains that various

building inspectors are monitoring his development of the

property, citing him, and telling him to cease construction on

the property because he lacks the proper permits.  In his first

complaint, Civil No. 07-00264 SOM/BMK ("1st Complaint"), Kuster

names four Defendants in their individual capacities.  These

Defendants work or have worked for the County of Maui.  Kuster

asserts that these individuals violated 42 U.S.C. §§ 1983 and

1985.  In the second complaint, Civil No. 07-00265 SOM/BMK ("2d

Complaint"), Kuster asserts that the County of Maui violated

§ 1983.  Kuster seeks damages and injunctive relief in both

complaints.  Although these complaints are long and convoluted,

they simply fail to allege viable constitutional violations.

Defendants are therefore entitled to summary judgment.

II.      SUMMARY JUDGMENT STANDARD.

         Effective December 1, 2007, Rule 56(c) of the Federal

Rules of Civil Procedure has been amended.  Summary judgment

shall be granted when "the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there

is no genuine issue as to any material fact and that the movant

is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(c) (effective Dec. 1, 2007).  "The language of Rule 56 has

been amended as part of the general restyling of the Civil Rules

to make them more easily understood and to make style and

terminology consistent throughout the rules.  These changes are intended to be stylistic only."  Rule 56 Advisory Committee Notes, 2007 Amendments.  Because no substantive change in Rule 56(c) was intended, the court interprets the new rule by applying precedent related to the prior version of Rule 56(c).

One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). Accordingly, "[o]nly admissible evidence may be considered in deciding a motion for summary judgment."  Miller v. Glenn Miller Prods., Inc., 454 F.3d 975, 988 (9th Cir. 2006).  Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial.  See Celotex, 477 U.S. at 323.  A moving party has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment.  Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).  The burden initially falls on the moving party to identify for the court "those portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323); accord Miller, 454 F.3d at 987.  "A fact is material if it could

affect the outcome of the suit under the governing substantive law." <u>Miller</u>, 454 F.3d at 987.

When the moving party fails to carry its initial burden of production, "the nonmoving party has no obligation to produce anything.  In such a case, the nonmoving party may defeat the motion for summary judgment without producing anything. <u>Nissan Fire</u>, 210 F.3d at 1102-03.  On the other hand, when the moving party meets its initial burden on a summary judgment motion, the "burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial." <u>Miller</u>, 454 F.3d at 987.  This means that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,</u> 475 U.S. 574, 586 (1986) (footnote omitted).  The nonmoving party may not rely on the mere allegations in the pleadings and instead "must set forth specific facts showing that there is a genuine issue for trial." <u>Porter v. Cal. Dep't of Corr.</u>, 419 F.3d 885, 891 (9th Cir. 2005) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986)).  "A genuine dispute arises if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>California v. Campbell</u>, 319 F.3d 1161, 1166 (9th Cir. 2003); <u>Addisu v. Fred Meyer, Inc.</u>, 198 F.3d 1130, 1134 (9th Cir. 2000) ("There must be

4

enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion.").

On a summary judgment motion, "the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor." Miller, 454 F.3d at 988 (quotations and brackets omitted).

The summary judgment burdens are properly applied to a motion asserting qualified immunity. See Butler v. San Diego Dist. Attorney's Office, 370 F.3d 956, 958 (9th Cir. 2004) ("When a defendant makes a properly supported motion for summary judgment based on official immunity, the plaintiff has an obligation to produce evidence of his or her own.  In such a case, the district court is not required (or even allowed) simply to assume the truth of challenged factual allegations in the complaint.  In other words, a motion for summary judgment based on official immunity is governed by Federal Rule of Civil Procedure 56, just like all motions for summary judgment in civil suits in federal district court.").

III.     BACKGROUND.

At the hearing on the present motion, Kuster made many factual representations not supported by the record, which the court disregards.  See Fed. R. Civ. P. 56(e).  Kuster also repeatedly referred to the record in general to support his various factual contentions.  This court has no duty to

independently search the lengthy record in this matter to find the factual support for Kuster's various contentions.  See Local Rule 56.1(f) ("When resolving motions for summary judgment, the court shall have no independent duty to search and consider any part of the court record not otherwise referenced in the separate concise statements of the parties.").[1]

Kuster owns three parcels of land in Haiku, Maui.  See Affidavit of Lothar Kuster (Apr. 17, 2008) ¶ 3.  Kuster has a residence on one of these properties.  Id. ¶ 31.  One parcel of land ("Lot 3") is undeveloped land zoned for agricultural use and located in a Special Management Area.  It is therefore subject to chapter 205A of the Hawaii Revised Statutes.  Wanting to build a structure on Lot 3, Kuster applied for a building permit in mid-2005.  Id. ¶ 51.

Kuster does not get along with his neighbors.  Id. ¶¶ 18, 19, 24.  Kuster has reported to the Building Department perceived building code violations on property belonging to one of his neighbors, Deborah Goodwin.  Id. ¶¶ 20, 21.  Another of Kuster's neighbors, Chris Gleason, complained to the Department

---

[1]Because Kuster's Opposition lacked citations to evidence in the record, Kuster was ordered to submit citations to evidence in the record supporting statements made in the Opposition.  On May 2, 2002, Kuster submitted an Amended Memorandum that exceeded applicable page and word limitations, as well as a motion to exceed those limitations.  Kuster's motion to file an oversized brief is granted, although that memorandum could have easily fit within the applicable limitations had it been restricted to relevant matters.

of Public Works for the County of Maui that Kuster was illegally

grading Lot 3 and shoving soil into Waipio Stream.  Id. ¶ 30;

Declaration of Ty Fukuroku (Feb. 12, 2008) ¶ 3; Ex. A.  Ty

Fukuroku, a Civil Engineer IV in the Department of Public Works,

was the inspector assigned to investigate Gleason's complaint.

Fukuroku Decl. ¶ 4.[2]

On February 3, 2006, Fukuroku went to Gleason's

property, planning to inspect Lot 3 with Gleason.  Fukuroku saw

unpermitted grading of Kuster's lot and obstruction of the Waipio

Stream drainageway.  Fukuroku says that, having been trained not

to enter private property to conduct inspections unless he had

the owner's consent, he conducted his inspection of the grading

of Lot 3 from an open field in which he saw no property markers.

Kuster confronted him in the open field and accused him of

trespassing on Kuster's land.[3]  Fukuroku Decl. ¶¶ 5-9.

--------

[2]At the hearing, Kuster argued that his neighbor was able to
call the inspectors without any fear that the neighbor's
"completely illegal" house would be cited by the inspector.  The
record does not appear to support this argument, as it appears
that Gleason called the inspector, while Kuster had been
complaining that Goodwin's house was illegal.  See Kuster Aff.
¶¶ 20, 21.  Gleason and Goodwin own separate properties, as
opposed to jointly owning the same property.

[3]Kuster submits two police reports that support Fukuroku's
assertion that the boundary between Kuster's undeveloped property
and Gleason's property is not clearly marked.  See Exhibit 6 ("R-
1 was on an unfenced/unmarked parcel of open property conducting
his investigation regarding illegal grading."); Exhibit 7 ("The
property involves overgrown vegetation which is located on a
hillside.  Unable to determine the exact property line due to the

Kuster says that the boundaries of Lot 3 are marked with fences and survey pins with flags.  Kuster Aff. ¶ 32. Kuster does not say, however, that the boundary between the Gleason property and Lot 3 is marked in a manner that easily identifies the lot line.  See id.  It is therefore unclear whether Fukuroku could tell where Gleason's property ended. Kuster notes that his residence, which is not located on Lot 3, is 350 feet from where Fukuroku was standing.  Kuster Aff. ¶ 31.

Kuster called the police and attempted unsuccessfully to have Fukuroku arrested.  Fukuroku Decl. ¶ 11.  Kuster then contacted the Office of the Prosecutor in an unsuccessful attempt to have Fukuroku prosecuted for trespassing.  Kuster Aff. ¶ 38.

Fukuroku sent Kuster a number of warnings regarding the grading violation.  See Fukuroku Decl. ¶ 13; Exs. E to G.  Kuster eventually obtained grading permits on March 30, 2006.  Fukuroku Decl. ¶ 17.

In his Opposition, Kuster complains about numerous inspections of his property allegedly conducted without his consent.  He says that he found out about these inspections only after filing the Complaints in these consolidated cases.  See, e.g., Opposition at 24 ("Discovery in this action has ascertained

---

overgrown brush and lack of a fence line.").  Because the police reports' statements about the property line in question are hearsay, this court does not rely on them in deciding the present motion.

that KUSTER's property has been inspected, without warrant, notice or permission by the following County employees: FUKUROKU, TAMMY OSURMAN, and MILTON ARAKAWA.  DANIEL ORNELLAS . . . also accompanied OSURMAN on her third inspection of Plaintiff's property.").  Kuster's post-Complaint discovery of these alleged "trespasses" makes it clear that they could not have provided the factual bases for any of the claims asserted in the Complaints.

On March 7, 2006, Kuster says he received a phone call from Jennifer Faufata, telling him that his building permit had been approved and was ready to be picked up.  Kuster Aff. ¶ 51. Kuster says that he immediately went to the Building Permit Office to get his permit.  Id. ¶ 52.  However, before Kuster picked up the permit, Faufata called Jay Arakawa to say that she had noticed that Lot 3 was in a Special Management Area.  Arakawa noted that, because a Special Management Area assessment application had not been submitted, no building permit should be issued to Kuster.  Declaration of Jay Arakawa (Feb. 12, 2008) ¶¶ 6-7.  Arakawa told Faufata not to issue the building permit to Kuster after all and offered to explain the situation to Kuster. Id. ¶ 11.

Kuster then met with Arakawa and Francis Cerizo, a staff planner, who explained to Kuster that he had to submit a Special Management Area assessment application so the County could determine whether permitting requirements applied to the

proposed farm dwelling on Lot 3.  Arakawa Decl. ¶ 14.  Kuster accordingly filled out and submitted a Special Management Area assessment application.  Id. ¶ 16.  The filing of that written application began the evaluation process.

Concerned that Lot 3 might have historical significance, Defendants asked the State Historic Preservation Division to comment on Kuster's proposed dwelling.  See Declaration of Gerald T. Azbill ¶ 4.  The State Historic Preservation Division has been woefully understaffed for some time, and there have been resulting delays in its response to requests for comment.  Such a delay occurred in its review of Kuster's application.  See Declaration of Jenny Lyn Pickett (Apr. 23, 2008) ¶ 7.  Only recently has the State Historic Preservation Division determined that there is a significant likelihood that there are historic features on Lot 3.  The State Historic Preservation Division, concerned that Kuster's construction activities may have already damaged some of these archaeological features, recommended on February 29, 2008, that an archaeological survey be done to evaluate the historic significance of Lot 3.  Id. ¶¶ 9, 10.  The Planning Department does not consider Kuster's March 2006 Special Management Area assessment application to be "complete" because it has not yet received a final opinion from the State Historic Preservation Division.  See Azbill Decl. ¶ 4.

Based on public records he reviewed through what he calls the "KIVA" system, Kuster asserts that, in November 2006, the State Historic Preservation Division found that no historic properties would be affected by Kuster's proposed dwelling.  See Ex. 26 ("NO HIST PROP AFFECTED REFERENCED IN A REPORT DATED NOV 1, 06 TO COMM. ON WTR.").[4]  Kuster complains that, in October 2007, the State Historic Preservation Division was asked to reevaluate the proposed dwelling.  Id. ("RTE TO DLNR 10/8/07 FOR REREVIEW ALONG WITH REPORT FROM COMMISSION ON WATER RESOURCE MANAGEMENT.").  Even assuming that the statements contained in Exhibit 26 fall within the public record exception to hearsay, Kuster fails to demonstrate that he has the necessary experience and expertise to interpret these statements.  Certainly, the alleged rereferral to the State Historic Preservation Division nearly five months after these consolidated Complaints were filed cannot form the bases of any claim asserted in the Complaints.

Only the Director of the Planning Department of the County of Maui, formerly Foley, can act on the Special Management Area assessment application.  See Rule 12-202-12(f) of the Special Management Area Rules for the Maui Planning Commission. The Director is supposed to make a determination "in writing within thirty calendar days after the application is complete."

---

[4]The "KIVA" system is an Internet-based record system.  See http://kivanetext.co.maui.hi.us/kivanet/2/land/lookup/index.cfm.

Id.  Kuster, who is still awaiting a decision, sues Foley for
failure to make a decision in a timely manner.  See 1st Complaint
¶ 40.

Kuster also complains that, in June 2006, Defendant
Charles Villalon called him four times, accusing him of being
"out to get" Villalon's inspectors and telling him to stop work
until he received proper Special Management Area clearance.  See
Kuster Aff. ¶ 71; Ex. 43 ("But if there's any further report or
confirmation that work is being done without the SMA clearance,
we'll issue fines.").

IV.      ANALYSIS.

At the hearing on Defendants' motion, it became clear
that, although Kuster had conspiracy theories, he had not
previously attempted to determine the legal bases for all of his
claims.  For example, after giving Kuster's counsel a copy of 42
U.S.C. § 1985 and allowing him time to read it, the court asked
counsel which subsections of § 1985 Kuster was proceeding under.
Without hesitation, Kuster's counsel stated that Kuster was
proceeding under all of the subsections.  The court pressed
counsel on that statement.  Eventually, counsel conceded that
parts of § 1985 were inapplicable.  This example is illustrative
of the general approach Kuster has taken to litigating these
consolidated cases.

A.    Defendants are Entitled to Summary Judgment on Kuster's § 1983 Claims.

Kuster's 1st Complaint alleges § 1983 claims based on violations of the Fourth Amendment (illegal search), the Fourteenth Amendment (procedural due process, substantive due process, and equal protection), and the First Amendment (retaliation).  Those alleged violations are actionable under § 1983, which states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.  For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.  "Section 1983 imposes two essential proof requirements upon a claimant: 1) that a person acting under color of state law committed the conduct at issue, and 2) that the conduct deprived the claimant of some right, privilege or immunity protected by the Constitution or laws of the United States."  Leer v. Murphy, 844 F.2d 628, 632-33 (9th Cir. 1988).

13

Kuster does not clearly articulate which claims are being asserted against which Defendants. The court has done its best to read both Complaints broadly but concludes that all individuals named as Defendants in the 1st Complaint are entitled to summary judgment on Kuster's § 1983 claims. With respect to the allegations in Count 1 of the 1st Complaint, each of them is entitled to qualified immunity. Kuster abandoned claims asserted in Count 2 of the 1st Complaint against individual Defendants. The County of Maui is also entitled to summary judgment on the § 1983 claims asserted in the 2d Complaint.

1.   Kuster's Claims are Ripe.

Defendants initially argue that the consolidated Complaints should be dismissed as not ripe. Defendants contend that Kuster may not maintain this action because a decision has not yet been made on whether to issue him a building permit or on how to treat his Special Management Area assessment application. Kuster, however, is not bringing this action based on a failure by Defendants to issue him permits, but instead on Defendants' alleged delay in deciding his Special Management Area assessment application, on Fukuroku's alleged trespass onto Lot 3, and on the alleged retaliation that Kuster says he suffered after complaining about Fukuroku's alleged trespass to the police. These claims are ripe for adjudication. See Municipality of Anchorage v. United States, 980 F.2d 1320, 1323 (9th Cir. 1992).

14

> 2.   Fukuroku Has Qualified Immunity With Respect to § 1983 Claims.

Fukuroku is alleged to have trespassed on Lot 3 to conduct an inspection without Kuster's consent.  Kuster argues that, in inspecting Lot 3, Fukuroku conducted an unreasonable search in violation of Kuster's Fourth Amendment rights.  Kuster does not appear to be asserting any other basis for a § 1983 claim against Fukuroku.

Fukuroku argues that he has qualified immunity with respect to this § 1983 claim.  "Qualified immunity . . . shields § 1983 defendants 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Devereaux v. Abbey, 263 F.3d 1070, 1074 (9th Cir. 2001) (en banc) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)); see also San Jose Charter of the Hells Angels Motorcycle Club v. City of San Jose, 402 F.3d 962, 971 (9th Cir. 2005).  The qualified immunity doctrine protects government officials from their exercise of poor judgment, and fails to protect only those who are "plainly incompetent or those who knowingly violate the law."  Malley v. Briggs, 475 U.S. 335, 341 (1986).  The purpose of qualified immunity is to protect officials from undue interference with their duties and from potentially disabling threats of liability.  Sinaloa Lake Owners Ass'n v. City of Simi Valley, 70 F.3d 1095, 1098 (9th Cir. 1994).  The Supreme Court has therefore

15

stated that qualified immunity is an entitlement not to stand trial or face the other burdens of litigation.  Saucier v. Katz, 533 U.S. 194, 200 (2001).  The Supreme Court has cautioned that a ruling on a qualified immunity defense "should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive."  Id.

Saucier defined the qualified immunity analysis as a two-step process.  First, a court examines whether the facts alleged, taken in the light most favorable to the party asserting the injury, show that the defendant's conduct violated a constitutional right.  If no constitutional right would have been violated by the alleged actions, a defendant has qualified immunity.  On the other hand, if a violation could be made out when the facts are interpreted in the light most favorable to the injured party, the next step is to ask whether the right was clearly established.  If the law did not put the defendant on notice that his or her conduct would clearly be unlawful, the official has qualified immunity from the claim.  Saucier, 533 U.S. at 201; see also San Jose Charter of the Hells Angels Motorcycle Club, 402 F.3d at 971; Beier v. City of Lewiston, 354 F.3d 1058, 1065 (9th Cir. 2004).  This second step is "'undertaken in light of the specific context of the case, and not as a broad general proposition.'"  Binque v. Prunchak, 512 F.3d 1169, 1173 (9th Cir. 2008) (quoting Saucier, 533 U.S. at 201).

In light of Saucier, this court's first inquiry is whether Fukuroku's conduct violated Kuster's Fourth Amendment rights.  The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  The Supreme Court has held that "searches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment-subject only to a few specifically established and well delineated exceptions." Minnesota v. Dickerson, 508 U.S. 366, 372 (1993) (emphasis in original) (internal quotation marks omitted).

Kuster is not complaining that Fukuroku searched his house.  Instead, Kuster is complaining that Fukuroku searched an undeveloped lot next to the lot on which his house was built.  By Kuster's own estimate, his house is more than a football field (350 feet) away from where Kuster was standing.  Even assuming Fukuroku's inspection of Lot 3 amounted to a search, it was not unreasonable.

In his Opposition, Kuster explains that the allegedly unreasonable search involved the curtilage of his house.  See Opposition at 23-24.  If a search falls within the curtilage of a house, a warrant is necessary.  See United States v. Depew, 8 F.3d 1424, 1426 (9th Cir. 1993) ("Although the Fourth Amendment's protection is accorded only to 'persons, houses, papers, and

17

effects' and not to 'open fields,' the Fourth Amendment does protect the 'curtilage' of a home."), overruled on other grounds by United States v. Johnson, 256 F.3d 895, 913 n.4 (9th Cir. 2001) (en banc); United States v. Gilman, 2007 WL 1310169, *3 (D. Haw. May 2, 2007) ("falling within the curtilage typically means property is protected from a warrantless search, and evidence from such a search is suppressed").  "The curtilage inquiry requires a court to determine whether an area 'harbors those intimate activities associated with domestic life and the privacies of the home.'"  United States v. Traynor, 990 F.2d 1153, 1156 (9th Cir. 1993), overruled on other grounds by Johnson, 256 F.3d at 913 n.4.

"Every curtilage determination is distinctive and stands or falls on its own unique set of facts."  United States v. Depew, 8 F.3d 1424, 1426 (9th Cir. 1993), overruled on other grounds by Johnson, 256 F.3d at 913 n.4.  In United States v. Dunn, 480 U.S. 294, 301 (1987), the Supreme Court stated that questions of curtilage should be

> resolved with particular reference to four factors:  the proximity of the area claimed to be curtilage to the home, whether the area is included in an enclosure surrounding the home, the nature of the uses to which the area is put, the steps taken by the resident to protect the area from observation by people passing by.

These factors "cannot be mechanically applied, but are merely useful analytical tools to determine whether an area is to be

protected from unconstitutional searches and seizures." <u>Johnson</u>, 256 F.3d at 901 (quoting <u>Dunn</u>, 480 U.S. at 301).

Standing more than a football field away from Kuster's home and on a different lot, Fukuroku did not violate the curtilage of Kuster's home. <u>See</u> <u>United States v. Brady</u>, 993 F.2d 177 (9th Cir. 1993) (holding that an outbuilding 45 feet from a residence, segregated from that home by a fence and highly visible from open fields surrounding the property, was not within the curtilage of the home).

At the hearing on the present motion, Kuster changed his theory and argued that, even if Fukuroku's inspection of Lot 3 did not involve the curtilage of his home, it violated the curtilage of his agricultural business. Kuster now complains that Fukuroku approached some of the plants and equipment located on Lot 3. In other words, Kuster contends that Fukuroku's inspection was improper because it was akin to an unreasonable search of his crops. Nothing in the admissible evidence before this court suggests that there was a building on Lot 3. Kuster cites no case in which the curtilage concept was extended beyond buildings and the areas immediately surrounding them. To the contrary, the Fourth Amendment protections do not extend to "open fields" next to a house. <u>See</u> <u>Oliver v. United States</u>, 466 U.S. 170, 176 (1984). "[O]pen fields do not provide the setting for those intimate activities that the Amendment is intended to shelter from

19

government interference or surveillance." Id. at 179.  There is no reasonable expectation of privacy in "open fields."  Id. Fukuroku did not violate the Fourth Amendment when he allegedly went onto Kuster's undeveloped Lot 3, as Kuster had no reasonable expectation of privacy there.

As this case involves allegations that Defendants are preventing Kuster from building a structure on Lot 3, Fukuroku's examination of Lot 3 was akin to a search of an "open field." Such a search had no possibility of intruding on the "intimate activities associated with domestic life and the privacies of the home." Traynor, 990 F.2d at 1156.  Accordingly, Fukuroku has qualified immunity with respect to Kuster's § 1983 claim because the facts alleged do not show that his alleged conduct violated Kuster's constitutional rights.  See Saucier, 533 U.S. at 201.

The court notes, in any event, that even assuming that Kuster had some kind of privacy right in the "open field" described as Lot 3, Fukuroku was not on notice that his conduct violated clearly established constitutional law.  Fukuroku says that, while inspecting Lot 3, he saw no property markers and that there "was no fence of any kind."  Fukuroku Decl. ¶ 7.  Fukuroku thought that he was on Gleason's property.  Id. ¶ 8.  Under these circumstances, even if Fukuroku had trespassed onto Kuster's property, that trespass was not unreasonable and did not violate Kuster's clearly established Fourth Amendment rights.  See United

20

States v. Sterling, 244 F. Supp. 534, 536 (D. Pa. 1965) ("If the enforcement officer reasonably believes that he is not trespassing on the suspect's property, his acts are not unreasonable even if he technically violates the unmarked boundary line and subjects himself to the venerable remedy of trespass quare clausum fregit.").

Kuster does not create a material issue of fact as to whether the boundary between Lot 3 and the Gleason's property was marked.  Fukuroku met his initial burden on this motion for summary judgment by attesting that there were no property boundary markings between Lot 3 and the Gleason's property.  The burden thus shifted to Kuster "to establish, beyond the pleadings, that there is a genuine issue for trial." Miller, 454 F.3d at 987.  In his affidavit, Kuster merely states that the boundaries of his property are marked with fences and survey pins with flags.  See Kuster Aff. ¶ 32.  Kuster does not create a genuine issue of fact by merely stating that Lot 3 had a fence somewhere on it.  Even when all reasonable inferences are drawn in Kuster's favor, he fails to establish that Fukuroku either saw or should have seen the alleged fence marking the specific boundary between Lot 3 and Gleason's property.

At the hearing, Kuster argued that his property was, at times, overgrown with vegetation and that Fukuroku must have crossed the lot line through a break in the fence caused by a

neighbor who tore it down.  In fact, his affidavit indicates that the fence that was allegedly destroyed by a neighbor was removed by a different neighbor, implying that the fence that was removed was not located between Lot 3 and Gleason's property.  See Kuster Aff. ¶ 28 ("February 1, 2006: I called Maui Police Dept. because I observed Deborah Goodwin destroying the fences on my property, cutting down trees, and removing survey stakes.").  In any event, even assuming that there was a fence between Lot 3 and Gleason's property, Kuster's affidavit does not state that the fence or the survey stakes were even visible, as opposed to being overgrown with the vegetation he complained about at the hearing.

Under these circumstances, Fukuroku has qualified immunity with respect to Kuster's § 1983 claim.  Kuster might be able to state a simple state-law trespass claim, but not a § 1983 claim, against Fukuroku.

### 3.   Foley Has Qualified Immunity With Respect to § 1983 Claims.

Kuster alleges that Michael Foley, the Director of the Department of Planning, County of Maui, from January 2, 2003, through January 1, 2007, see Declaration of Michael Foley (Feb. 11, 2008) ¶ 2, failed to make a timely decision on Kuster's Special Management Area assessment application.  Kuster says that, in June 2006, he sent letters to Foley complaining about the delays he was experiencing, his contacts with inspectors, and

the lack of inspections of properties owned by his neighbor, Deborah Goodwin.  See Kuster Aff. ¶¶ 69, 78; Exhibits 41 and 45. Kuster says that he has still not received a response from Foley. See Kuster Aff. ¶¶ 69, 78.

At his deposition, Foley testified that he did not open his own mail and did not remember seeing any letter from Kuster or hearing any discussion about Kuster's complaints.  Deposition of Michael Foley (Feb. 27, 2008) at 7 (attached as Ex. 62). Kuster says that Foley's conduct violated Kuster's Fourteenth Amendment procedural and substantive due process rights, his Fourteenth Amendment equal protection rights, and his First Amendment rights.  Foley claims qualified immunity with respect to these § 1983 claims.

a.   Procedural Due Process.

Before the court can decide whether Kuster's procedural due process rights under the Fourteenth Amendment have been violated, the court must make the threshold determination of whether Kuster had any interest in property or liberty sufficient to trigger the due process protections of the Fourteenth Amendment.  See Board of Regents of State Coll. v. Roth, 408 U.S. 564, 569 (1972).  At the hearing, Kuster conceded that he had no liberty interest sufficient to trigger the due process protections of the Fourteenth Amendment.  Kuster argued, however, that he had a property interest.

23

Property interests "are created and their dimensions
are defined by existing rules or understanding that stem from an
independent source such as state law-rules or understanding that
secure certain benefits and that support claims of entitlement to
those benefits." Board of Regents of State Colleges v. Roth, 408
U.S. 564, 577 (1972); see also Orloff v. Cleveland, 708 F.2d 372,
377 (9th Cir. 1983) ("Entitlements are created by 'rules or
understandings' from independent sources, such as statutes,
regulations, and ordinances, or express or implied contracts.").
"To have a property interest in a benefit, a person clearly must
have more than an abstract need or desire and more than a
unilateral expectation of it.  He must, instead, have a
legitimate claim of entitlement to it." Town of Castle Rock,
Colo. v. Gonzales, 545 U.S. 748, 756 (2005) (quotations and
citations omitted).

Property interests are "determined largely by the
language of the statute and the extent to which the entitlement
is couched in mandatory terms." Assoc. of Orange County Deputy
Sheriffs v. Gates, 716 F.2d 733, 734 (9th Cir. 1983).  Thus, in
Cassidy v. State of Hawaii, Department of Transportation, Harbors
Division, 915 F.2d 528 (9th Cir. 1990), the Ninth Circuit
concluded that a mooring permit issued under the Hawaii
Administrative Rules was not a property right protected by the
Fourteenth Amendment because the Harbors Division reserved the

24

discretion to renew the permit.  Id. at 531; see also Connecticut Board of Pardons v. Dumschat, 452 U.S. 458, 465 (1981).

Kuster claims that he had a property interest in having Foley decide his Special Management Area assessment application. Only the Director of the Planning Department of the County of Maui, formerly Defendant Mike Foley, was empowered to act on that application.  See Rule 12-202-12(f) of the Special Management Area Rules for the Maui Planning Commission.  As Director, Foley was required to make that determination "within thirty calendar days after the application is complete."  Id.  Kuster claims that he filled out his application in March 2006 and did not get a decision within 30 days.  Kuster, however, assumes that his application was complete the moment he signed it and turned it in.  That is simply not the case.  The submission of that written application was the beginning of the process of evaluating it.

Because Lot 3 may have historic significance, Gerald Azbill, a Plans Technician for the Planning Department of the County of Maui, asked the State Historic Preservation Division to comment on Kuster's proposed dwelling.  See Azbill Decl. ¶ 4. State Historic Preservation Division comments take a long time to obtain because of under-staffing.  See Declaration of Jenny Lyn Pickett (Apr. 23, 2008) ¶ 7.  It is only recently that the State Historic Preservation Division determined that there was a significant likelihood that there are historic properties on

Lot 3 and expressed concern that Kuster's construction activities may have already damaged some of these archaeological features. Id. ¶ 9.  On February 29, 2008, the State Historic Preservation Division recommended that an archaeological survey be done to evaluate the historic significance of Lot 3.  Id. ¶ 10.  Because it has not received full comment from the State Historic Preservation Division on Kuster's Special Management Area assessment application, the Planning Department does not consider Kuster's March 2006 Special Management Area assessment application to be "complete".  See Azbill Decl. ¶ 4.  Given the incomplete application, the Director of the Planning Department does not even begin to count the 30 days to act on the application.  See Rule 12-202-12(f) of the Special Management Area Rules for the Maui Planning Commission.

The court is unpersuaded by Kuster's argument at the hearing that, as a matter of practice, the Director always decides a Special Management Area assessment application within 30 or 45 days of when a member of the public submits it.  That argument appears to rely on Kuster's interpretation of the "KIVA" public records, and Kuster has not shown that he has the necessary personal knowledge to decode and explain those cryptic files and notations, see Fed. R. Civ. P. 56(e), or that he has other personal knowledge that all other applications were decided

within 30 or 45 days.  Kuster's affidavit does not even claim that all other applications were decided in that time frame.

Kuster brought several feet of documents to the hearing and asked this court to take judicial notice of what he said were the public records in those documents.  This court declined to do so for several reasons.  First, Kuster had an obligation to submit relevant evidence to this court at the time he filed his Opposition and concise statement of facts.  <u>See</u> Local Rule 56.1(b) and (c).  Second, this court has no duty to search voluminous evidence for factual support of contentions made by a party.  <u>See</u> Local Rule 56.1(f).  Finally, accepting such a large stack of documents at the hearing would have deprived Defendants of their right to reply to arguments raised by those documents. <u>See</u> Local Rule 7.4.

Kuster also argues that he is "exempt" from chapter 205A requirements.  He says that, under section 205A-22, his proposed dwelling is not a "development."  However, that section only defines "development" as not including the construction "of a single-family residence that is not part of a larger development."  It is not clear that Kuster's proposed dwelling "is not part of a larger development," as Kuster also has a residence on a neighboring property.  Even if Kuster's proposed construction is not a "development," that does not mean that there has been a federal constitutional violation.  A mistaken

27

application of state law, even assuming that occurred, is not necessarily a constitutional violation.

The court is also unpersuaded by Kuster's argument that Foley unreasonably delayed making a decision on Kuster's application in September and October 2007.  At the hearing, Kuster argued that, according to the "KIVA" public records, his application was "completed" on September 25, 2007, and that he was therefore entitled to have a decision on his application no later than October 2007.  There are numerous problems with this argument.  First, Kuster has not demonstrated his ability to interpret the "KIVA" public records such that he can raise an issue of fact about whether the application was "complete" at that time.  More importantly, however, Foley ceased being the Director of the Planning Department on January 1, 2007.  Foley cannot be individually liable for a delay that occurred after he left his position.  Finally, Kuster's Complaints were filed in May 2007.  Factual events that occurred in September and October 2007 cannot form the grounds for any claim in the earlier-filed consolidated Complaints.

Foley has qualified immunity with respect to Kuster's § 1983 procedural due process claims because Kuster does not allege a viable procedural due process claim.

b.    Substantive Due Process.

To demonstrate a substantive due process violation, a plaintiff is ordinarily required to prove that a challenged government action was clearly arbitrary and unreasonable, having no substantial relation to public health, safety, morals, or general welfare.  See Patel v. Penman, 103 F.3d 868, 874 (9th Cir. 1996).  The Supreme Court has explained that, for governmental action to be so arbitrary and unreasonable, it must "shock the conscience."  County of Sacramento v. Lewis, 523 U.S. 833, 846-47 (1998); United States v. Salerno, 481 U.S. 739, 746 (1987) ("'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience,' . . . or interferes with rights 'implicit in the concept of ordered liberty'" (citations omitted)).

The Ninth Circuit has recognized that an arbitrary refusal to withhold a building permit violates substantive due process rights.  See Bateson v. Geisse, 857 F.2d 1300, 1303-04 (9th Cir. 1998).  Here, however, Kuster has failed to raise a genuine issue of fact as to whether Foley arbitrarily delayed his decision on Kuster's Special Management Area assessment application.  Kuster has not even established a current entitlement to have a decision on that application.  Under these circumstances, Kuster's 1st Complaint fails to allege a viable

29

substantive due process claim against Foley, and Foley has qualified immunity with respect to that claim.

           c.   <u>Equal Protection.</u>

       The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws.  This is essentially a direction that all persons similarly situated be treated alike.  <u>Plyler v. Doe</u>, 457 U.S. 202, 216 (1982); <u>High Tech Gays v. Defense Indus. Sec. Clearance Office</u>, 895 F.2d 563, 570-71, <u>reh'g denied</u>, 909 F.2d 375 (9th Cir. 1990).  Even assuming Kuster is in a protected class, which is not at all clear, he has not shown that Foley, who was the Director of the Planning Department from January 2, 2003, until January 1, 2007, treated another similarly situated person more favorably by deciding a Special Management Area assessment application before it was "completed."

       The court recognizes that Kuster need not identify another applicant who was in exactly the same situation he was in.  Kuster must only point to similarly situated persons.  But Kuster does not identify any similarly situated person at all. Kuster merely says that he has reviewed all of the 2006 Special Management Area assessment applications and that, of the 224 applications, only 122 were sent to the State Historic Preservation Division.  <u>See</u> Kuster Aff. ¶ 11.  Kuster says that

his permit application differs from the 40 other applications that have not yet been acted on.  Id.  Kuster's affidavit fails to demonstrate that anyone else who was similarly situated was treated more favorably.

In paragraph 14 of his affidavit, Kuster sets forth a list of instances in which he says he was treated differently from other people.  Although Kuster names Foley in his individual capacity in the 1st Complaint, Kuster does not describe Foley's involvement in these other instances.  Kuster cannot hold Foley responsible under § 1983 for alleged wrongs he suffered at the hands of others.  See Kuster Aff. ¶ 14.

Because Kuster fails to allege a viable equal protection claim against Foley, he has qualified immunity with respect to that claim.

d.    First Amendment Retaliation.

Kuster appears to be alleging a free speech retaliation claim against Foley.  Such a claim is cognizable under § 1983. See, e.g., Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1314 (9th Cir. 1989) ("Deliberate retaliation by state actors against an individual's exercise of this right [to petition the government for redress of grievances] is actionable under section 1983.").  A First Amendment retaliation claim requires a plaintiff to show that the defendant's acts "would chill or

31

silence a person of ordinary firmness from future First Amendment activities." <u>See</u> <u>Mendocino Envtl. Ctr. v. Mendocino County</u>, 192 F.3d 1283, 1300-01 (9th Cir. 1999).

Even assuming Kuster engaged in protected First Amendment speech when he called the police about Fukuroku's alleged trespass on Lot 3, Foley is not individually liable for the alleged retaliation that Kuster suffered. First, it does not appear that Kuster has pled a First Amendment claim against Foley. <u>See</u> 1st Complaint ¶ 45 ("The pattern or inaction by County employees with regard to Plaintiff KUSTER's permit, with no reasonable explanation, has continued for over a year. This appears to be direct retaliation for complaints made by Plaintiff KUSTER regarding several obviously illegal searches of his property by Maui County Building and Safety employees"), and ¶ 49 ("A short argument ensued between Frances Cerizo and the inspectors regarding the propriety of the search by FUKUROKU. As a result of this argument, it was obvious to Plaintiff that Plaintiff KUSTER's permit was being held up in retaliation for his complaints regarding FUKUROKU.").

Even if pled, Kuster does not raise an issue of fact regarding whether Foley even knew about the alleged trespass incident. Foley states that he could not have retaliated against Kuster based on Kuster's complaint to police about Fukuroku because Foley did not even know that Kuster had made any such

32

complaint.  See Declaration of Michael Foley (Feb. 11, 2008) ¶ 16.  Kuster points to nothing in the record indicating that Foley did know about the Fukuroku incident.  Foley therefore has qualified immunity with respect to Kuster's § 1983 claim based on an alleged First Amendment violation.

In his Opposition, Kuster argues that Foley also retaliated against him for complaining about Goodwin's property. This theory of liability, however, is not alleged in the 1st Complaint.  See 1st Complaint ¶¶ 45, 49.  Even if it were deemed to have been alleged, Kuster fails to demonstrate a viable First Amendment retaliation claim because he submits no evidence indicating that Foley even knew Kuster had complained about Goodwin's property.  In fact, he notes that Foley testified in his deposition that he did not open his own mail and did not remember seeing any letter from Kuster or hearing any discussion about Kuster's complaints.  See Foley Depo. at 7 (attached as Ex. 62).

> 4.   Arakawa Has Qualified Immunity With Respect to § 1983 Claims.

Kuster alleges that Arakawa stopped him from receiving his building permit.  Although the 1st Complaint does not clearly identify the alleged constitutional violations suffered as a result, Kuster stated at the hearing that he was asserting

against Arakawa procedural and substantive due process claims, an equal protection claim, and a First Amendment retaliation claim.

Arakawa, a Zoning Inspector for the Planning Department, County of Maui, see Declaration of Jay Arakawa (Feb. 12, 2008), argues that he has qualified immunity with respect to these claims.  He says that he stopped the building permit from being issued to Kuster because a Special Management Area assessment application had not been submitted or acted on.  Id. ¶¶ 6-8, 11-12.  He says that his actions were not caused by Kuster's calls to the police about Fukuroku's inspection of Lot 3.  Id. ¶ 19.

Kuster fails to demonstrate a procedural due process violation because Kuster had no legitimate expectation that the building permit would issue.  See Gonzales, 545 U.S. at 756.  One of the requirements for receiving a building permit in the Special Management Area is completing the Special Management Area assessment application process.  See Arakawa Decl. ¶ 7.  As discussed above, Kuster has not completed that process and had not completed it when Arakawa told Faufata not to issue the building permit to Kuster.  Under these circumstances, Kuster fails to allege a viable procedural due process claim.

Nor does Kuster allege a viable substantive due process claim based on Arakawa's decision to refrain from issuing the building permit to Kuster.  Because Kuster had not completed all

34

of the requirements for receiving such a permit, he cannot demonstrate that Arakawa's decision was arbitrary and unreasonable.  See Patel, 103 F.3d at 874; Bateson, 857 F.2d at 1303-04.

Kuster also fails to allege a viable equal protection claim against Arakawa, as he fails to demonstrate that another person whose property was in the Special Management Area received a building permit without having to do a Special Management Area assessment application or to complete the Special Management Area permit process.  See Plyler, 457 U.S. at 216; High Tech Gays, 895 F.2d at 570-71.

Finally, Kuster fails to allege a viable First Amendment retaliation claim against Arakawa.  Kuster says that Arakawa retaliated against him by withholding the building permit because Kuster had called the police when Fukuroku inspected Lot 3.  As explained above, Kuster was required to complete the Special Management Area assessment application process before receiving his building permit.  Because Kuster did not complete that process, he had no entitlement to the building permit. Under these circumstances, it cannot be said that Arakawa's refusal to issue the building permit to Kuster "would chill or silence a person of ordinary firmness from future First Amendment activities."  See Mendocino Envtl. Ctr., 192 F.3d at 1300-01.

35

Arakawa therefore has qualified immunity with respect to Kuster's § 1983 claims.

>    5.   Villalon Has Qualified Immunity With Respect
>         to § 1983 Claims.

Kuster asserts that, in June 2006, Villalon called him four times, accusing him of being "out to get" Villalon's inspectors and telling him to stop work until he received Special Management Area clearance.  See Kuster Aff. ¶ 71; Ex. 43 ("But if there's any further report or confirmation that work is being done without the SMA clearance, we'll issue fines.").  Because it did not appear that this meager allegation alleged any viable claim, the court asked Kuster at the hearing to identify the claims being asserted against Villalon.  Kuster said that he was asserting procedural and substantive due process claims, an equal protection claim, and a First Amendment retaliation claim.

Villalon, a Zoning Inspector for the Planning Department, County of Maui, see Declaration of Charles Villalon (Feb. 12, 2008), argues that he has qualified immunity with respect to these claims.

As discussed above, Kuster fails to allege a viable procedural due process violation because Kuster had no legitimate expectation that the building permit would issue.  See Gonzales, 545 U.S. at 756.  Nor does Kuster allege a viable substantive due process claim because he cannot demonstrate that Villalon's

36

conduct in telling Kuster to stop unpermitted work in the Special Management Area was arbitrary or unreasonable.  See Patel, 103 F.3d at 874; Bateson, 857 F.2d at 1303-04.  Kuster fails to allege a viable equal protection claim against Villalon, as he fails to show that another similarly situated person was treated differently by Villalon.  See Plyler, 457 U.S. at 216; High Tech Gays, 895 F.2d at 570-71.

Kuster also fails to allege a viable First Amendment retaliation claim against Villalon.  Kuster says that, three months after he called the police about Fukuroku's inspection of Lot 3, Villalon, a Zoning Inspector, retaliated against him by calling him four times and telling him to stop doing unpermitted work, threatening Kuster with fines if the unpermitted work continued.  Even assuming Kuster was exercising protected speech by calling the police, it cannot be said that a Zoning Inspector's enforcement of Special Management Area regulations three months later "would chill or silence a person of ordinary firmness from future First Amendment activities."  See Mendocino Envtl. Ctr., 192 F.3d at 1300-01.

Villalon therefore has qualified immunity with respect to all of Kuster's § 1983 claims.

6.   The County of Maui is Not Liable Under § 1983 With Respect to Claims Asserted in the 2[d] Complaint.

Kuster asserts that the County of Maui also violated § 1983.  Local governmental bodies such as the County of Maui are "persons" that may be sued under § 1983.  See Monell v. Dep't of Social Servs., 436 U.S. 658, 690 (1978).  However, under § 1983, the County of Maui is only liable for its own actions.  The County of Maui is not liable under § 1983 based on respondeat superior liability, as it is with respect to negligence claims.  Id. at 694.  Kuster has failed to establish the possibility of municipal liability here.

Municipal liability under § 1983 may generally be established in one of three ways.

> First, the plaintiff may prove that a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity. Second, the plaintiff may establish that the individual who committed the constitutional tort was an official with final policy-making authority and that the challenged action itself thus constituted an act of official governmental policy.  Whether a particular official has final policy-making authority is a question of state law.  Third, the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it.

38

Gillette v. Delmore, 979 F.2d 1342, 1346-47 (9th Cir. 1993)
(citations and internal quotations omitted).

Although Kuster's 2[d] Complaint is unclear, his
Opposition asserts that "County supervisors had an unwritten
policy of allowing discriminatory and retaliatory application of
zoning enforcement provisions." See Opposition at 26.  Kuster
asserts that this is part of the County's overall policy of
preventing development, especially by non-"locals." Id. at 27-
28.  Kuster says that his Special Management Area assessment
application has been "allowed to languish for years without being
processed." Id.  Because Kuster has failed to demonstrate that
he had a right to have his application decided by the time he
filed the 2[d] Complaint, he fails to demonstrate that any County of
Maui policy caused him to suffer a constitutional violation.

Rule 12-202-12(f) of the Special Management Area Rules
for the Maui Planning Commission requires the Director of the
Planning Department, County of Maui, to rule on Special
Management Area assessment applications within 30 days of
"completion."  As discussed above, Kuster's application has not
been completed.  See Azbill Decl. ¶ 4.  No municipal policy
therefore violated the Constitution or gave rise to a claim under
§ 1983.

There are also "limited circumstances in which an
allegation of a 'failure to train' can be the basis for liability

39

under § 1983." <u>City of Canton v. Harris</u>, 489 U.S. 378, 387 (1989). "[I]nadequacy of . . . training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." <u>Id.</u> at 388. In other words, only when a city's "failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." <u>Id.</u> Moreover, for liability to attach to a municipality's failure to train, the lack of training "must be <u>closely related</u> to the ultimate injury." <u>Lee v. City of Los Angeles</u>, 250 F.3d 668, 681 (9th Cir. 2001). "In other words, a plaintiff must show that his or her constitutional 'injury would have been avoided' had the governmental entity properly trained its employees." <u>Id.</u>

"Deliberate indifference" occurs when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." <u>City of Canton</u>, 489 U.S. at 390; <u>accord</u> <u>Gregory v. County of Maui</u>, 414 F. Supp. 2d 965, 969 (D. Haw. 2006), <u>aff'd</u> -- F.3d --, 2008 WL 1869007 (9th Cir. Apr. 29, 2008).

40

Kuster argues that the County of Maui failed to train its employees and that such failure amounted to a policy actionable under § 1983.  Kuster says that Fukuroku's alleged trespass onto Lot 3 demonstrates that Fukuroku was not trained to know that he was not allowed to enter private property without the landowner's consent.  See Opposition at 28.  Kuster says that the boundaries of Lot 3 are marked with fences and survey pins with flags.  Kuster Aff. ¶ 32.  Kuster does not say, however, that the boundary between the Gleason property and Lot 3 was marked in a manner that easily identified the lot line.  See id.

Fukuroku says that he inspected Lot 3's grading from an open field in which he saw no property markers.  Fukuroku Decl. ¶¶ 5-9.  Fukuroku says that he was trained to refrain from entering private property to conduct inspections unless he had the owner's consent.  Id. ¶ 8.  Under these circumstances, Kuster's mere allegation does not create a factual issue as to whether the County of Maui was deliberately indifferent.

Kuster's Opposition also argues that Azbill was improperly trained because he only received "on-the-job" training and a brief description of what a Special Management Area is. See Opposition at 28.  However, there is no allegation that Azbill's conduct caused Kuster harm.  Kuster therefore does not show that his "constitutional 'injury would have been avoided'

41

had the governmental entity properly trained" Azbill.  See Lee, 250 F.3d at 681.

Generally, whether a City has displayed a policy of deliberate indifference to the constitutional rights of its citizens is a jury question.  Gibson v. County of Washoe, 290 F.3d 1175, 1194-95 (9th Cir. 2002).  However, Kuster raises no question for the jury.  He offers no evidence at all of anything more than, at most, an error or negligence by Fukuroku.  Under these circumstances, the County of Maui is entitled to summary judgment on the § 1983 claims asserted against it in the 2d Complaint.

B.    Conspiracy Claim.

The Third Claim for Relief in the 1st Complaint asserts that the individually named Defendants conspired to violate Kuster's civil rights.  Because the 1st Complaint did not identify the basis or bases for this claim, the court questioned Kuster's counsel about this claim.  At the hearing on the present motion, Kuster indicated that he is claiming a violation of 42 U.S.C. §§ 1985 and 1986, and, after being pressed on the issue, identified the subsections of § 1985 applicable to his conspiracy allegations.  Kuster is proceeding under the second clause of § 1985(2) and the first and second clauses of § 1985(3).

The second clause of § 1985(2) provides for a claim if:

42

> two or more persons conspire for the purpose
> of impeding, hindering, obstructing, or
> defeating, in any manner, the due course of
> justice in any State or Territory, with
> intent to deny any citizen the equal
> protection of the laws, or to injure him or
> his property for lawfully enforcing, or
> attempting to enforce, the right of any
> person, or class of persons, to the equal
> protection of the laws.

The first clause of § 1985(3) prohibits private conspiracies to deny equal protection of the laws. The second clause of § 1985(3) prohibits conspiracies "for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws." The last, or fifth clause, of § 1983(3) provides the cause of action for violations of the first and second clauses of § 1983(3).

Given Kuster's identification of the subsections of § 1983 under which he is proceeding, it is clear that he is basing his conspiracy claim on alleged equal protection violations. At the hearing on the present motion, Kuster complained that he was treated differently from others. However, as discussed above, Kuster has not shown that any similarly situated person was treated better than he was. Kuster's affidavit fails to demonstrate that he has personal knowledge of what happened to Goodwin's property as a result of his complaints. <u>See</u> Fed. R. Evid. 602 ("A witness may not testify to

43

a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge.").  However, even assuming Goodwin was not cited for having a structure without proper permits, that failure does not demonstrate an equal protection violation.  The failure to cite existing violations is not similar to Defendants' failure to grant Kuster a building permit in the first place.  There is no evidence that the deadlines, procedures, staffing, or decisions regarding existing structures are the same as for proposed structures. Kuster does not establish similarity with his neighbor with respect to Defendants' attempts to ensure that Kuster complied with applicable Special Management Area laws and regulations or the alleged delay in the Planning Commission Director's decision on Kuster's Special Management Area assessment application. Kuster simply fails to allege viable equal protection claims. Accordingly, summary judgment is granted in favor of Defendants on the § 1985 claims.

Kuster is also claiming a violation of § 1986, which "imposes liability on every person who knows of an impending violation of section 1985 but neglects or refuses to prevent the violation." Karim-Panahi v. Los Angeles Police Dept., 839 F.2d 621, 626 (9th Cir. 1988).  Because Kuster fails to demonstrate a violation of § 1985, he has no viable § 1986 claim, as a § 1986

claim depends on the existence of a valid § 1985 claim.  <u>See</u>
<u>Sanchez v. City of Santa Ana</u>, 936 F.2d 1027, 1040 (9th Cir. 1991).

   C. The Complaints Fail to Assert Any Other Viable
     <u>Causes of Action.</u>

   The court has attempted to examine all of the counts
alleged in the consolidated Complaints.  Because of the vagueness
of those Complaints, the court is unable to determine whether any
other claim exists in these matters.  For example, in his 1st
Complaint, Kuster appears to be asserting that Defendants
violated 18 U.S.C. § 1951 (Hobbs Act) and § 1341 (criminal
fraud).  <u>See</u> 1st Complaint ¶ 52.  However, there is no private
right of action under either statute in these actions, which
contain no RICO claim.  <u>See</u> <u>Wisdom v. First Midwest Bank, of</u>
<u>Poplar Bluff</u>, 167 F.3d 402, 409 (8th Cir. 1999) ("We agree that
neither the statutory language of 18 U.S.C. § 1951 nor its
legislative history reflect an intent by Congress to create a
private right of action.  We hold therefore, that the district
court correctly dismissed the . . . claims based on a private
right of action . . . .");  <u>Wilcox v. First Interstate Bank of</u>
<u>Oregon, N.A.</u>, 815 F.2d 522, 533 (9th Cir. 1987) ("Other than in
the context of RICO, federal appellate courts hold that there is
no private right of action for mail fraud under 18 U.S.C.
§ 1341.").  An alleged violation of those criminal prohibitions
does not provide Kuster with any basis for a civil action.

Because there may be other claims that Kuster is asserting but that the court has not been able to discern, the Clerk of Court is directed to refrain from entering judgment in this matter until at least through May 28, 2008. No later than May 28, 2008, Kuster may file a statement of not more than 1,000 words indicating that other claims remain for adjudication, describing the claims, and identifying the paragraphs of the Complaints in which the claims are asserted. If Kuster files such a statement, the Clerk of Court is directed to refrain from entering judgment until this court orders otherwise. If Kuster does not timely identify remaining claims, the Clerk of Court is directed to enter judgment in favor of Defendants pursuant to this order after May 28, 2008.

V.      CONCLUSION.

For the reasons set forth above, the court grants the motion for summary judgment. The Clerk of Court, however, shall refrain from entering judgment pursuant to this order until after May 28, 2008. No later than May 28, 2008, Kuster may file a statement indicating that other claims alleged in the consolidated Complaints have not been adjudicated. If no such statement is timely filed, the Clerk of Court is directed to

46

enter judgment in favor of Defendants after May 28, 2008, and to close this case.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, May 13, 2008.



  /s/ Susan Oki Mollway
Susan Oki Mollway
United States District Judge

Kuster v. Foley, et al., Civ. No. 07-00264 SOM/BMK; Kuster v. County of Maui, Civ. No. 07-265 SOM/BMK (consolidated); ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT